UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **Bunnie and Jean Clayton, individuals;** on behalf of themselves and all others similarly situated,<br><br>**Plaintiffs,**<br><br>v.<br><br>**CENTURYLINK, INC.**, a Louisiana corporation; **CENTURYLINK COMMUNICATIONS, LLC**, a Delaware limited liability company; **CENTURYLINK PUBLIC COMMUNICATIONS, INC.**, a Florida Corporation; **CENTURYLINK SALES SOLUTIONS, INC.**, a Delaware Corporation<br><br>**Defendants** | **CLASS ACTION COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br><br>**CASE NO.: 1:17-CV-921** |

**CLASS ACTION COMPLAINT**

### I.      INTRODUCTION

Plaintiffs Bunnie and Jean Clayton ("Plaintiffs"), individually and as representatives of a class of similarly situated persons and/or entities, allege as follows:

### II.     NATURE OF ACTION

1.      This lawsuit challenges CenturyLink's misleading and deceptive conduct, adding false and unauthorized charges for its customers' communications services, including telephone, internet, and/or television accounts. This Class Action is brought to obtain declaratory, injunctive, equitable, and monetary relief. As outlined further below, CenturyLink's conduct violated applicable consumer protection statutes, breached customer contracts, and/or resulted in Defendants being unjustly enriched at the expense of their customers. The relief sought, including an accounting and the payment of refunds for all overcharges, is both necessary and appropriate.

### III.    PARTIES

2.      Plaintiffs Bunnie and Jean Clayton are citizens of North Carolina and reside Hurdle Mills, Person County, North Carolina.

3.      Plaintiffs were overcharged and injured in a manner similar to the Class defined below as a result of Defendants' common and systematic policies complained of herein. Plaintiffs are qualified and appropriate representatives of a group of customers of Defendants who are similarly situated and have suffered harm in the same manner as Plaintiffs as a result of the actions and/or omissions of the Defendants described within.

4.      Defendants are CenturyLink, Inc.; CenturyLink Communications, LLC; CenturyLink Public Communications, Inc.; CenturyLink Sales Solutions, Inc; ("Defendants" or "CenturyLink"). CenturyLink, Inc is a Louisiana corporation doing business in the state of North Carolina as

CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc, which are all registered to do business in the state of North Carolina. Upon information and belief, CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc, are direct and/or indirect subsidiaries of CenturyLink Inc. All profits of CenturyLink Communications, LLC, CenturyLink Public Communications, Inc., CenturyLink Sales Solutions, Inc., including those obtained from the practices complained of herein, are ultimately up-streamed to CenturyLink, Inc., and reported on its financial statements.

5.      As described on its website, "CenturyLink (NYSE:CTL) is a global communications and IT services company focused on connecting its customers to the power of the digital world. CenturyLink offers network and data systems management, big data analytics, managed security services, hosting, cloud, and IT consulting services. The company provides broadband, voice, video, advanced data and managed network services over a robust 265,000-route-mile U.S. fiber network and a 360,000-route-mile international transport network."
Available at http://ir.centurylink.com/CorporateProfile.aspx?iid=4057179

6.      At all material times, CenturyLink, Inc., its subsidiaries, and affiliates have maintained legal authority to transact business in North Carolina and have maintained operations throughout the state of North Carolina, including the Middle District. CenturyLink is a large corporate provider of telephone and data transmission services, including telephone, high-speed internet, and television services for both residential and commercial consumers throughout the United States, including North Carolina.

7.      As a result of the challenged practices, Defendants generated substantial sales of its services and merchandise within North Carolina during the relevant Class Period, resulting in the collection of significant fee revenue from the members of the Class.

8.      All Defendants are affiliated entities. All Defendants do business in North Carolina as "CenturyLink" and hold themselves out to the public, Plaintiffs, and the Class as "CenturyLink." All Defendants use common "CenturyLink" logos and trademarks in letters, billings, marketing, and advertisements directed to the public, Plaintiffs, and the Class. The shared branding renders the CenturyLink entities indistinguishable.

9.      Plaintiffs are informed and believe, and based thereon allege, that at all times mentioned herein, each of the Defendants was the agent, servant, employee, co-venturer, and/or co-conspirator of each of the remaining Defendants, and was at all times herein mentioned acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of and for such agency, employment, joint venture, and conspiracy.

10.     Plaintiffs are further informed and believe, and based thereon allege, that at all relevant times, each Defendant was completely dominated and controlled by its co-Defendants, and each was the alter ego of the other. Whenever and wherever reference is made in this Complaint to any conduct by Defendant or Defendants, such allegations and references shall also be deemed to mean the conduct of each of the Defendants, acting individually, jointly, and severally.

11.     Whenever and wherever reference is made to individuals who are not named as Defendants in this Complaint, but were employees and/or agents of Defendants, such individuals at all relevant times acted on behalf of Defendants named in this Complaint within the scope of their respective employments.

**IV. JURISDICTION AND VENUE**

12.     This Court has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action where: (1) there are more than one hundred and fifty (150) members in the proposed class; (2) various members of the proposed class are citizens of states different from where Defendants are citizens; and (3) the amount in controversy, exclusive of interest and costs, exceeds $5,000,000.00, in the aggregate.

13.     The United States District Court for the Middle District of North Carolina is an appropriate venue as CenturyLink provides services to Plaintiffs and members of the Class within the District, which gave rise to the claims stated herein; a substantial amount of the events giving rise to this Class Action occurred within the District. Defendants also maintain call centers, data systems centers and/or other operations in North Carolina, where, upon information and belief, some of the events complained of herein relating to Class member's accounts occurred and emanated from.

14.     The Court has supplemental jurisdiction over Plaintiffs' state claims under 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' and Class Members' claims occurred in the Middle District of North Carolina. Defendants: (a) are authorized to conduct business in this District and have intentionally availed themselves of the laws within this District; (b) currently conduct substantial business in this District; and (c) are subject to personal jurisdiction in this District. Defendants conducted business with Plaintiffs, over the course of several years, and overcharged them in the deceptive and misleading manner described herein. Plaintiffs reside within this District and dealt with Defendants in both the manner described within this Complaint and in this District. North Carolina has an overriding interest in protecting consumers and in prohibiting corporations from carrying out deceptive and misleading practices in North Carolina and through interstate commerce.

**V. BACKGROUND FACTS**

16.     On June 14, 2017, former CenturyLink employee Heidi Heiser filed a whistleblower complaint in the Superior Court of Arizona for Maricopa County, alleging that she was terminated for reporting to her supervisors and the CEO unlawful billing practices she observed and refused to take part in as a sales representative. *Heiser v. CenturyLink, Inc.*, No. CV2017-008928 (Maricopa Cty. Super. Ct.). Attached hereto as Exhibit A is a true and correct copy of Ms. Heiser's whistleblower complaint (hereinafter "*Heiser*" or "*Heiser* complaint," incorporated by reference herein).

17.     As explained in the *Heiser* complaint, Defendants maintained (an) incentive program(s) for their employees and agents, which provided financial incentives to charge customers for services they did not order and/or to overcharge customers for services they did order. Rather than uphold its duty to act in good faith and to ensure that it carefully charged consumers only in the correct amounts, and for services that consumers authorized, Defendants shifted the burden to consumers and essentially dared them to locate the overcharges and demand refunds.

18.     Fee generation is at the heart of Defendants' business model. At all relevant times, Defendants sought to maximize the number of services for which they could bill customers in the Class. Defendants had a financial incentive to employ and continue such incentive programs, as it increased their revenues and profits. At the same time, Defendants' employment of such incentive programs harmed and injured consumers financially as they paid the charges that were improperly imposed to keep their accounts current.

19.     Ms. Heiser's allegations of what she observed, and what the CenturyLink corporate culture encouraged, are consistent with the experiences of thousands of consumers who have been wronged by CenturyLink.

20.     A digital revolt against CenturyLink's fraud has been fomented by subscribers on social media and consumer watchdog websites.

21.     For example, the following consumer complaints are emblematic of CenturyLink's practices as described in the *Heiser* complaint:



22.     These types of communications reporting overcharges show CenturyLink blaming consumers as opposed to taking responsibility for its billing practices and conduct. These types of complaints are rampant in accounts posted online by other victims of Defendants' practices, demonstrating a pattern and practice of Defendants' violation of applicable consumer protection statutes, breach of customer contracts, and unjust enrichment at the expense of its customers.

23.     Rather than take care to ensure that they only billed consumers for amounts actually authorized and agreed to, as Defendants had a duty to do, Defendants have attempted to shift the burden to its customers to locate overcharges and then demand refunds within a short time frame. The amounts billed to each customer each month are relatively small (less than $200) and Defendants know that certain customers will have little time to actively monitor, search for billing discrepancies, and immediately demand corrective action when appropriate. Defendants have taken advantage of and exploited this dynamic. This "catch-us-if-you-can" policy is unfair, deceptive, and misleading. For example, an outraged subscriber posted the following communication on social media:



24. When customers post their written communications, complaining of CenturyLink creating and billing for duplicate accounts, CenturyLink blames the subscriber or implies that the subscriber is somehow under "fraud review." For example, one subscriber posted the following communication regarding CenturyLink's duplicative billing:



25. These screenshots are not outliers. There are literally thousands of pages of consumer complaints—primarily focused on fraudulent billing practices—lodged on Consumer Affairs' websites. Many consumers state that the only reason they rated CenturyLink with "one star" was that "zero stars" is not an option.
*See, e.g.,* https://www.consumeraffairs.com/cell_phones/centurylink.html.

26. Further, searching Twitter and Facebook with the word "CenturyLink" and any number of additional keywords such as "scam," "fraud," "ripoff," and "bill", demonstrates significant levels of discord, desperation, and demands from victims to remedy CenturyLink's unlawful practices. A standard Google search of "CenturyLink Complaints" provides similar results.

27. At least one state's attorney general has investigated and entered into an "assurance of discontinuance" with CenturyLink, which prohibits certain conduct described and complained of herein, including billing consumers at higher rates than those it represented during sales calls with consumers. *See* Approval of Assurance of Discontinuance, *In the Matter of Qwest Corp, d/b/a/ CenturyLink QC*, No. CV2016-002842 (Superior Court, Maricopa County, Arizona) (filed April 13, 2016). Despite this, the conduct complained of remains ongoing. Other states' attorneys general have commenced actions and/or investigations Defendants' practices.[1] The foregoing demonstrates

---

[1] *See* Press Release, Attorney General Swanson Sues CenturyLink for Billing Higher Amounts than its Sales Agents Quoted to Customers for Internet and Cable Service, July 12, 2017 (http://www.ag.state.mn.us/Office/PressRelease/20170712_CenturyLink.asp) ("Minnesota Attorney General Lori Swanson filed a lawsuit today against CenturyLink—the Louisiana phone, cable, and internet company—for billing higher amounts than its sales agents quoted customers for internet and cable television service. The company often refused to honor the prices quoted to consumers who catch the discrepancies on their bills….The company's internal

that Defendants have been engaged in far more than the odd, unintentional mistake, or rare miscommunication in their dealings with the Class. Rather, it demonstrates that Defendants acted intentionally to create a new profit center at the expense of unsuspecting customers who had placed their trust in Defendants to bill them accurately, honestly, and only withdraw from their bank accounts (many which were set up for electronic autopay deductions) the amounts actually due and agreed upon. Internal sales quotas helped drive the overcharges and deceptive practices complained about.

28.     Defendants had a duty to act honestly and in good faith towards Plaintiffs and the Class and to only bill and collect funds actually due and mutually agreed upon. In providing Defendants access to auto-deduct funds from Plaintiffs' bank and financial accounts, Defendants owed Plaintiffs and the Class an additional duty not to help itself to excessive and unauthorized fees, or otherwise convert Plaintiffs' funds. Defendants breached this duty.

29.     The offending and unlawful conduct by CenturyLink, throughout the United States, including North Carolina, includes but is not limited to:

> i. Billing its customers for phone lines or service items never requested by the customer;
>
> ii. Billing its customers higher rates than the rates quoted during the sales calls;
>
> iii. Billing its customers early termination fees when customers cancelled the services due to higher rates;
>
> iv. Billing its customers when they cancelled their service upon learning the quality was not as represented;
>
> v. Billing its customers for periods of service before the service was connected, for products never received, and failing to credit consumers for these erroneous charges;
>
> vi. Billing its customers for services and products that the consumer never requested without giving the consumer a credit for these charges;
>
> vii. Failing to process its customers' service cancellation requests in a timely manner and billing them for the period of the time the service remained connected following the request for cancellation, without providing a credit for this time period;
>
> viii. Charging its customers full price for leased modems that consumers returned to CenturyLink within the required timeframe, and then referring the consumers account to collections when the consumer refused to pay for the returned modem;
>
> ix. Charging pro-rated charges without adding discounts in on the price customers were quoted; and
>
> x. Collecting excessive and unauthorized funds from Class members beyond those mutually agreed to.

---

records acknowledge this problem. For example, in one e-mail from 2015, a company employee described receiving "so many" complaints every day and that "maybe 1 out of 5 are quoted correctly or close enough. I have one today quoted $39 and its [sic] over $100 monthly. So I tend to get on the defensive for the customer at times because of the large amount that are misquoted. As in many cases, the customer calls in for several months and [is] promised call backs, passed around, or cut off before going to the AG, PUC, FCC or BBB…")

30.     Defendants' employees (such as Ms. Heiser) have acknowledged the foregoing types of programs and activities and have reported the offenses to Defendants. But Defendants nonetheless continue to employ the fraudulent programs to generate revenue. The pattern demonstrates both Defendants' true intent and that any financial gains from such activities are not inadvertent but intentional, fraudulently obtained through false pretenses, unearned, and ill-gotten.

31.     The types of practices described above affected Plaintiffs and members of the Class of other CenturyLink subscribers in North Carolina.

32.     At all relevant times Plaintiffs Jean and Bunnie Clayton were customers of CenturyLink and were overcharged for services in amounts exceeding what was agreed upon and were quoted for, and/or were charged for services that were never agreed upon.  Further, in the Clayton's area CenturyLink has a monopoly on internet service and is the only option.

33.     Defendants' conduct towards Plaintiffs was misleading. Defendants' conduct was calculated to cause confusion and deceive its customers who were in the same circumstances as Plaintiffs.

34.     Unless Defendants are enjoined from continuing their misconduct, Plaintiffs and others similarly situated remain at risk of future overcharges of the same or similar kind due to Defendants' continued and ongoing maintenance of the incentive programs, and other overcharge and fee cramming mechanisms employed.

35.     By reason of the foregoing, Plaintiffs have been damaged, injured, and incurred financial loss as a result of the common practices alleged.

**VI. Plaintiffs and the Class did not assent to any arbitration agreement nor class waiver.**

36.     This action concerns CenturyLink's secret, intra-corporate-employee-incentive program, done without the knowledge, consent, authorization, or agreement of Plaintiffs and the Class. At the time when Plaintiffs and the Class discussed and agreed to the terms of services, Plaintiffs and the Class had no knowledge of CenturyLink's internal program, nor did CenturyLink ever disclose it.

37.     Under North Carolina law, before a dispute can be ordered resolved through arbitration, there must be a valid agreement to arbitrate. *United Steelworkers v. Warrior & G. Nav. Co.*, 363 U.S. 574, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960); *Sloan Fin. Grp., Inc. v. Beckett*, 159 N.C.App. 470, 477, 583 S.E.2d 325, 329 (2003).

38.     "Parties to an arbitration must specify clearly the scope and terms of their agreement to arbitrate." *Futrelle v. Duke University*, 127 N.C. App. 244, 488 S.E.2d 635, *disc. review denied*, 347 N.C. 398, 494 S.E.2d 412 (1977). The court cannot force a party to submit to arbitration unless the party has agreed to do so.  *AT&T Technologies v. Communications Workers*, 475 U.S. 643, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).

39.     Plaintiffs and the Class were not signatories to any written contract with CenturyLink containing a class waiver or arbitration provision. If CenturyLink can adduce evidence of an arbitration agreement or class waiver between it and Plaintiffs and/or the Class, then this action is outside the scope of any such arbitration agreement or class waiver. Plaintiffs and the Class never signed any contract containing or otherwise referring to an arbitration agreement or class waiver. Nor did CenturyLink, when discussing and agreeing to the terms of service with Plaintiffs and the Class, ever disclose or mention the existence of an arbitration agreement or class waiver applicable to Plaintiffs and the Class. Therefore, Plaintiffs and the Class cannot be bound by any arbitration

agreement or class waiver because none exists. In the alternative, even if CenturyLink were to adduce evidence of an arbitration agreement or class waiver with Plaintiffs or Class members as signatories, then, due to CenturyLink's fraud and misrepresentations, this action is outside the scope of any such agreement. In the alternative, any arbitration agreement or class waiver adduced by CenturyLink is not part of the contract with Plaintiffs and the Class.

40.     Upon information and belief, CenturyLink generally signs up new customers by telephone. Upon information and belief, it is CenturyLink's regular practice to have one of its representatives discuss service options on the telephone with the prospective customer then schedule an installation appointment. After the appointment, CenturyLink begins billing the customer. Furthermore, upon information and belief, it is CenturyLink's routine practice to tell the customer that the promotional rate can only be provided if the customer consents to automatic payments through CenturyLink's online billing program. Thus, at the outset of the transaction, CenturyLink requires consent to automatically draft the consumer's account for the "promotional rate", but the invoices later propounded to the customers are much higher amounts than the promotional rates.

41.     Fraud is present because Plaintiffs and the Class agreed to monthly automatic drafts solely for the promotional rate and not the substantially higher amounts actually drafted at later times by CenturyLink. Plaintiff and the Class would not have entered an agreement, including an agreement to arbitrate, had CenturyLink disclosed that the amount Plaintiffs and the Class would actually be billed every month was much larger than the "promotional rate". Therefore, even if CenturyLink adduces evidence that Plaintiffs and the Class signed any arbitration clause or class waiver during the course of contract formation, such arbitration clause or class waiver would be unenforceable because of CenturyLink's fraud in inducing Plaintiffs and the Class to enter the arbitration and/or class waiver agreements.

## VII. CLASS ACTION ALLEGATIONS

42.     This action is brought, and may properly be maintained, as a class action under Fed. R. Civ. P. 23 because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

43.     The Class is defined to include: "All persons in the state of North Carolina who contracted with Defendants for telephone, television, and/or internet service during the relevant Class Period". The "Class Period" dates back to the length of the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through present and the date of judgment. Excluded from the Class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies, the undersigned counsel for Plaintiffs and their employees, and the judge and court staff to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the class if discovery or further investigation reveals that the class should be expanded or otherwise modified.

44.     This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

   **(a) Numerosity**: The Plaintiff Class is so numerous that the individual joinder of all members is impractical under the circumstances of this case. While the exact number of Class Members is unknown to Plaintiffs at this time, Plaintiffs are informed and believe, and based thereon alleges, that thousands of consumers have been victimized by CenturyLink's practices in Florida, in the manner described above.

**(b) Commonality**: Common questions of law and fact exist as to all members of the Plaintiff Class and predominate over any questions that affect only individual members of the Class. The common questions of law and fact include but are not limited to:
> (i) Whether Defendants maintained programs to incentivize employees and agents to overcharge Class Members for services Class Members did not order or approve;
> (ii) Whether Defendants maintained a program of shifting responsibility to its customers to discover the overcharges they imposed, as opposed to billing and collecting service fees from consumers accurately and in good faith;
> (iii) Whether Defendants made misrepresentations or omissions of material fact about their telecommunications services, billings, and/or employee incentive programs;
> (iv) Whether Defendants breached any implied or explicit contractual obligations to subscribers or deceptively billed for services not being offered, contemplated, or agreed upon;
> (v) Whether Defendants breached the implied covenant of good faith and fair dealing made part of all contracts;
> (vi) Whether Defendants violated their duties to Plaintiffs and the Class;
> (vii) Whether Defendants should be required to conduct an equitable accounting and provide refunds; and
> (viii) Whether Defendants have been unjustly enriched.

**(c) Typicality**: Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs and the members of the Class sustained damages arising out of CenturyLink's common practices and wrongful and fraudulent conduct as alleged herein.

**(d) Adequacy**: Plaintiff and the undersigned counsel will fairly and adequately protect the interests of the Class Members. Plaintiff has no interest that is adverse to the interests of the other Class Members and has hired counsel experienced in class actions, complex litigation, and trial practice.

**(e) Superiority**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Because individual joinder of all members of the class is impractical, class action treatment will permit a large number of similarly situated persons to simultaneously prosecute their common claims in a single forum, efficiently, and without unnecessary duplication of effort and expense that numerous individual actions would engender. The expenses and burdens of individual litigation would make it difficult or impossible for individual members of the Class to redress the wrongs done to them, while important public interests will be served by addressing the matter as a class action. The cost to and burden on the court system of adjudication of individualized litigation would be substantial, and significantly more than the costs and burdens of a class action. Class litigation would also prevent the potential for inconsistent or contradictory judgments.

**(f) Public Policy Considerations**: When a company or individual engages in fraudulent and predatory conduct with large swaths of consumers, it is often difficult or impossible for the vast majority of those consumers to bring individual actions against the offending party. Many consumers are either unaware that redress is available or unable to obtain counsel to obtain that redress for financial or other reasons. Class actions provide the class members who are not named in the complaint with a vehicle to achieve vindication of their rights. The members of this Class are so numerous that the joinder of all members would be impractical and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the court. There is a well-defined community of interest in the

questions of law or fact affecting the Plaintiff Class in that the legal questions of consumer fraud, breach of contract, and other causes of action, are common to the Class Members. The factual questions relating to CenturyLink's wrongful conduct and their ill-gotten gains are also common to the Class Members.

**(g) Risk of Continuing Harm**: The practices complained of are of an ongoing and continuing nature. Most Class Members remain unaware of the practices complained of. The risk of continuing and future harm from the practices complained of continues to exist, making injunctive, declaratory, and equitable relief appropriate and necessary. Injunctive and declaratory relief barring Defendants' continuation of these practices and notice to the Class is appropriate and necessary. Absent such relief, the amounts Defendants will improperly collect in the future will exceed that already collected. Injunctive and declaratory relief is therefore predominant.

## VIII. CAUSES OF ACTION
## COUNT I
## VIOLATION OF NORTH CAROLINA'S DECEPTIVE TRADE PRACTICES ACT
### (N.C. Gen. Stat § 75-1.1, et seq.)

45.  Plaintiffs re-allege and incorporate by reference all previous paragraphs.

46.  Pursuant to the North Carolina Deceptive Trade Practices Act ("NCDTPA"), it is unlawful to engage in any "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat § 75-1.1 (a).

47.  Defendants violated the NCDTPA by engaging in false, misleading, and deceptive acts and practices in the conduct of trade and commerce.

48.  CenturyLink violated the NCDTPA by the wrongdoing alleged, which constitutes unconscionable, false, misleading, and deceptive acts and practices in the conduct of trade or commerce.

49.  The Plaintiffs and Class suffered injury in fact and actual damages from the wrongdoing, because they suffered inconvenience (and expense associated with it), mental anguish, and financial harm, including incurring fees or fines associated with CenturyLink's unauthorized, unfair, and deceptive acts and practices. Each of these injuries was proximately caused by CenturyLink's unconscionable, false, fraudulent and deceptive business practices.

50.  The facts concealed and omitted by CenturyLink to the Plaintiffs and Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to contract or otherwise engage in business with CenturyLink. Had the Plaintiffs and Class members known about the deceptive business practices, they would not have done business with CenturyLink.

51.  As alleged herein, CenturyLink, through its employees and agents, has engaged in a pattern and practice of deceptive and misleading activity, and collection of monies by way of false pretenses. Defendants engaged in deceptive, unconscionable, false, misleading and/or unfair business practices by, among other things, causing the members of the Class to be enrolled in services they did not request or authorize, billing at higher rates than those quoted, billing for early termination fees, continuing to bill customers after they had canceled their accounts, adding charges,

and requiring consumers to pay for previously undisclosed fees in connection with signing up for Defendants' services. The amounts charged, collected, and auto-deducted from bank accounts (or otherwise billed and collected) are material terms to CenturyLink customers. Deceptively overcharging consumers in a manner they are unlikely to detect within a short time period is a material misrepresentation or an omission of material fact to reasonable consumers and the Class. As set forth in the *Heiser* complaint, the foregoing occurred and Class Members were injured because Defendants maintained an incentive program for their employees and agents which provided financial incentives to them to engage in such conduct.

52.     Defendants acted with the intent that Plaintiffs and members of the Class rely on their concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise. The amounts billed to each customer each month are relatively small (less than $200) and therefore, Defendants know that certain customers will have little time to actively monitor and immediately seek corrections when appropriate. Defendants seek to exploit and take advantage of the dynamic.

53.     The conduct described herein is continuing. The conduct was engaged in for profit, as a deliberate corporate policy, rather than as an isolated incident, was morally wrong, callous, and/or oppressive.

54.     Therefore, the Plaintiffs and Class members are entitled to equitable and monetary relief under the NCDTPA.

## COUNT II
## BREACH OF CONTRACT

55.     Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

56.     Plaintiffs and each member of the Class entered into contracts with Defendants for the provision of telephone, internet, television, and/or other services at certain costs. Plaintiffs performed under the contracts.

57.     As explained above, Defendants maintained (an) incentive program(s) for their employees and agents which provided financial incentives to them to charge customers for services consumers in the Class did not order and/or to overcharge those consumers for services they did order.

58.     Defendants overcharged Plaintiffs and members of the Class in breach of their contracts and the overcharging is a material breach.

59.     Plaintiffs and Class Members were charged for services for which they did not agree to pay, and/or for services they agreed but in amounts exceeding that they agreed to pay.

60.     Plaintiffs and the Class were injured, harmed, and incurred financial loss by way of Defendants' conduct in amounts to be determined at trial.

   61.     As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

## COUNT III

**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

62. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

63. Implied in every contract is a duty of good faith and fair dealing.

64. Defendants had a duty to treat Plaintiffs fairly, and to accurately bill, collect, and account for funds mutually agreed upon. In providing Plaintiffs access to auto-deduct funds from Plaintiffs' and Class Members' bank and financial accounts, Defendants owed Plaintiffs and the Class a duty not to help itself to excessive and unauthorized fees, or otherwise convert Plaintiffs' funds.

65. By its actions herein, Defendants breached that duty and did not act fairly, nor in good faith.

66. Plaintiffs and the Class were injured, harmed, and incurred financial loss by way of Defendants' conduct in amounts to be determined at trial.

67. As a result of the foregoing, Plaintiffs and the Class are entitled to, among other things, compensatory damages, an accounting, and all other relief deemed just and equitable by the Court.

**COUNT IV**
**ACCOUNTING**

68. Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

69. Defendants had a duty to accurately charge, collect, and deduct from Plaintiffs' bank/financial accounts only those amounts mutually agreed to.

70. As explained above, Defendants maintained an incentive program(s) for their employees and agents which provided financial incentives to charge customers for services they did not order and/or to overcharge consumers for services they did order.

71. As a result, Defendants maintained a system of overcharging and collecting from Plaintiffs and the other members of the Class monies which they did not agree to pay.

72. As a result of the foregoing, Defendants have received money, a portion of which is due to Plaintiffs and the Class.

73. The amount of money due from Defendants to Plaintiffs and the Class is currently unknown to Plaintiffs and cannot be ascertained without an accounting of the receipts and disbursements of the Class' transactions and accounts with Defendants. Plaintiffs, on behalf of the Class, therefore demand an accounting of the aforementioned transactions from Defendants and payment of the amount found due which Defendants have failed and refused— and continues to fail and refuse—to pay such sum. Such accounting should be conducted at Defendants' cost and expense.

74. Defendants maintained sole custody and control of their accounts and billing systems. Defendants also had exclusive access to the internal incentive programs offered to their agents and employees. Many Class Members agreed to have Defendants auto-deduct payments from their bank accounts, placing trust in Defendants to only bill them and collect amounts that they actually agreed to pay and in good faith. By way of the foregoing, Defendants have had a special relationship with Plaintiffs and the Class and a duty to account accurately for the amounts charged and collected for services performed and provided.

75. Defendants failed to bill and collect sums from Plaintiffs and the Class consistent with their agreements. Plaintiffs and the Class trusted and relied on Defendants to bill them accurately and only collect amounts properly due. Many Class Members unsuspectingly provided Defendants authorization for automatic payments and withdrawals. As shown above and in the attached exhibits, there is a widespread history with overbilling and inaccurate collections by Defendants which requires review and oversight.

76. An accounting and audit is necessary. A balance due from the Defendants to Plaintiffs and the Class can only be ascertained through such an accounting.

77. Given Defendants' superior knowledge and access to records, as well as their duty to only bill and collect monies in good faith, Defendants are in the superior and exclusive position to confirm the accuracy of their accounts and collections from Class Members and provide refunds.

78. Defendants should be ordered to provide an accounting of each Class Member's account, at its sole expense (along with appropriate supervision), to ensure that Class Members have not been overcharged. To the extent they have been overcharged (as with Plaintiffs), Defendants should be ordered to immediately refund the difference with interest, along with all other relief found just and equitable, including but not limited to reasonable attorney fees and costs.

## COUNT V
## UNJUST ENRICHMENT

79. Plaintiffs re-allege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

80. As a result of Defendants' unlawful and deceptive practices described above, Defendants have been unjustly enriched in retaining revenues derived from Plaintiffs' and Class Members' payments for Defendants' services. Retention of that revenue under these circumstances is unjust and inequitable because Defendants used illegal, deceptive, and unfair business practices to induce or force customers to open, purchase, and/or maintain services and products and/or billed them for services not requested or provided.

81. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and members of the Class for its unjust enrichment, along with all other relief found just and equitable in the premises, including reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class Members, pray for judgment as follows:

## CLASS CERTIFICATION

1. For an order certifying the proposed Class pursuant to Fed. R. Civ. P. Rules 23(a), 23(b)(2), and/or 23(b)(3);

2. That Plaintiffs be appointed as the representatives of the Class; and

3. That the undersigned counsel for Plaintiffs be appointed as Class Counsel.

## AS TO ALL CAUSES OF ACTION

1. For an order finding in favor of Plaintiffs and the Class Members on all counts asserted herein;

2. For an order declaring that Defendants' conduct violates the statutes and laws referenced herein;

3. For all actual, consequential, statutory, and incidental losses and damages, according to proof;

4. For appropriate injunctive relief, including an order prohibiting continuation of the practices complained of;

5. For an accounting;

6. For punitive damages, where permitted by law;

7. For reasonable attorney fees and costs, where permitted by law;

8. For prejudgment interest on all amounts awarded;

9. For corrective notice to any credit reporting agencies;

10. For costs of suit herein incurred; and

11. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.


Respectfully submitted: October 13, 2017

  s/T. Ryan Langley

**T. Ryan Langley**
**Hodge & Langley Law Firm**
Federal ID No. 10047
NC Bar No. 51273
229 Magnolia Street
PO Box 2765
Spartanburg, SC 29304
(864) 585-3873

Attorneys for Plaintiffs